## Gould, *plaintiff in error, vs.* Hutchins.

In an action brought by the clerk of a militia company, to recover a penalty for neglect to do duty therein, on the ground that the supposed delinquent had belonged to another company in the same town, which had been disbanded by the Governor and Council, and annexed to the company of which the plaintiff was clerk, it was held, to be necessary that, there be proof of the bounds of such disbanded company, and that the defendant resided within them.

*Held* also, that, *parol* proof was inadmissible to show such bounds — the *record* being the only legal evidence thereof.

Where by statute the Commander-in-Chief was authorized to disband a company and annex it to another in case of " refusal or neglect to choose officers when " thereto required," the mere voting for persons whom the Colonel of the Regiment might deem " wholly unfit," (such persons being legally eligible,) was held, not to amount to such " neglect" and " refusal," and consequently as furnishing no sufficient basis for the act of the Commander-in-Chief in disbanding such company.

The authority given to selectmen by *statute of March* 9, 1832, " to *define* the " limits of every company of infantry in their respective towns," was held not to be limited to that merely of *reestablishing old limits;* but to that of establishing new, by enlarging or curtailing former limits.

This was a writ of error, brought to reverse the judgment of a justice of the peace rendered against the present plaintiff, in an action brought by the present defendant as clerk of a company of infantry, commanded by *Oliver Adams*, to recover a military fine. The facts reported by the justice, and material to be stated, were that, *Gould*, the plaintiff in error, formerly belonged to a company commanded by one *Oliver Bourne ;* that on being ordered out to choose officers, a part of them cast blank votes, and a part voted for persons whom the Colonel of the Regiment deemed, and reported to be, " *wholly unfit to hold any office.*" — Whereupon the company was disbanded by the Governor and Council, and annexed to the company under the command of *Adams,* both being in the town of *Kennebunk-port.*

There was no evidence, except by *parol,* of the bounds of such disbanded company, and that *Gould* resided within them.

After such disbanding of the company and before the time of *Gould's* alleged delinquency, the selectmen of the town, by virtue of their authority, derived from statute passed *March* 9,

1832, " defined" the limits of the several companies, in such manner as thereby to exclude *Gould* from the company under the command of *Adams*.

There were numerous errors assigned, but those only are noticed in the report of the argument of counsel, upon which the Court gave an opinion.

*J. & E. Shepley*, for the plaintiff in error.

1. There was no evidence that *Gould* resided within the bounds of *Adams'* company, which must be shown before he can be called upon to do duty therein.

2. He did not become a member of *Adams'* company by the disbanding of *Bourne's* and its annexation to the former.

1. Because the Governor and Council had no authority to disband such company, under the circumstances. The Colonel's report to the Commander-in-Chief, does not show such a *neglect* and *refusal* to choose officers as the statute contemplates. It is contended that, it is not necessary that every man should vote in an election of officers ; if it were so, then any one of them by throwing a blank vote might destroy an election and cause the company to be disbanded. But they did vote in this case, and for ought that appears, for a man who was eligible, though not considered *fit* by the Colonel. But of the fitness and qualifications, the law has made the company the exclusive judges. The Colonel should therefore have returned the man voted for, that he might have been duly commissioned. The contingency on which the Governor could act had not happened, and the whole proceeding therefore was illegal.

2. Because it does not appear that the company under the command of *Adams* was " the oldest adjoining standing company." The Governor possesses no arbitrary power to annex a disbanded company to any that he may think proper. He can only annex it to " the oldest adjoining standing company."

3. Because, if the *Bourne* company was legally disbanded, and properly annexed to *Adams'* company, still there was no evidence that *Gould* belonged to it, by proof of the bounds of the company, and that he resided within them ; except by *parol*, which is inadmissible.

4. By defining the limits of the several companies in the town of *Kennebunk-port*, by the selectmen, *Gould* has been excluded from *Adams'* company. Now this act of the selectmen is valid or it is not. If it be not valid, then the clerk has shown no bounds to the company of *Adams*, and *Gould* of course cannot be liable. If it be valid, then *Gould* is excluded from *Adams'* company, and therefore, is not liable to do duty therein.

*Leland*, for the defendant in error, insisted that, in the disbanding of the company formerly commanded by *Bourne*, the authority of the law had been strictly pursued. The representation of the Colonel was, that the company *neglected* and *refused* to choose officers, inasmuch as part of them threw blank votes, and part of them voted for persons wholly unfit to hold any office. This he contended was a substantial occurrence of the event contemplated in the statute. It was actually neglecting to choose, when they threw blank votes. It would be virtually neglecting to choose, to cast their votes for one *non compos mentis*, or one " wholly unfit for any office."

2. Proof by *parol* was sufficient to show the bounds of the company. If it were not so, half the companies in the State would be set afloat, having been formed in the infancy of the country, when the *forms* of law were perhaps not so strictly regarded as at the present day. Besides, it may be asked, what principle of law would be violated by the admission of parol evidence for this purpose ?

3. The new location of boundaries by the selectmen, cannot affect this case. Their power to " *define*" the limits of companies, extending merely to reestablishing of old lines and boundaries. It is like the power given to selectmen to " perambulate" town lines once in five years. This confers no power to change or alter in any respect old town lines, but merely to " define," — to make plain and certain, that which was supposed to be obscure and uncertain. And so of the power of selectmen in defining the limits of companies.

The opinion of the Court was delivered at the ensuing *April* term, in this county, by

PARRIS J. — This is a writ of error, brought to reverse a judgment rendered against the plaintiff in error, in a suit against him for the recovery of a penalty for his non-appearance at a company training of a company of infantry in *Kennebunk-port,* whereof *Oliver Adams* is commanding officer, and the defendant is clerk. The record of the justice of the peace, whose judgment we are called upon to examine, purports to contain a statement of all the facts, as they appeared at the trial, and on which the judgment was rendered. The first error assigned is, that *Hutchins* was not legally appointed and qualified as clerk. The case does not shew how he was appointed and qualified. The justice's record refers to the sergeant's warrant and certificate of appointment and qualification on the back, as making a part of his report of the case ; but neither warrant or certificate are furnished. We have, therefore, no means of ascertaining whether there be any error in the justice's decision upon this point.

The second error assigned is, that *Adams* was not the legal commander of the company of militia within the bounds of which the defendant below resided ; and third, because the defendant below did not reside within the limits of the company purporting to be commanded by said *Adams,* nor was he liable to do military duty therein. It is not pretended that *Gould* resided within the original limits of the company whereof *Adams* is commanding officer, but that by virtue of certain proceedings of the Governor and Council, he became so far a member of that company as to be by law liable to perform military duty therein. The proceedings relied upon are a report of the standing committee of the Council on military affairs, as follows, " The standing committee on military affairs to which " was referred a communication from *Major-General Waterman* " of the first Division, accompanying a communication from *F.* " *A. Symonds, Lieut. Colonel* of the fourth Regiment, first Bri- " gade in said Division, representing that the company of in- " fantry in *Kennebunk-port,* formerly under the command of " *Captain Oliver Brown, (Bourne,)* is entirely destitute of of-

" ficers, and were ordered out on the 30th of *July* last, for the
" choice of officers ; but they refused to elect any officers, by
" casting blank votes in part, and partly by voting for a man
" wholly unfit to hold any office whatever, &c. Report, that
" for the reasons set forth in said communication, &c. said com-
" pany ought to be disbanded, and recommend that the Com-
" mander-in-Chief be advised to cause an order to be issued
" whereby said company shall be disbanded, and the members
" be attached to the company under the command of *Ensign*
" *Oliver Adams,* in said *Kennebunk-port* ;" which report was
accepted by the Council and approved by the Governor on the
16th of *March,* 1832, and a general order issued thereon on the
20th of *March,* requiring the Major-General of the first Divis-
ion to " cause the foregoing order in Council to be carried into
" effect."

It is by virtue of these proceedings that *Gould* is charged as
liable to perform duty in the company under the command of
*Adams.* Supposing these proceedings to be all correct and
legal, of which we shall hereafter consider, was there any evi-
dence shewing that *Gould* was a member of the disbanded
company or resided within the limits thereof. Unless such was
the fact the doings of the Governor and Council could have no
effect upon him. As the plaintiff, in the case before the jus-
tice, was prosecuting for a penalty, the burden was on him to
sustain all his material allegations by competent proof. He
must, among other facts, shew that the person charged was a
member of the company of which he was clerk, or liable to per-
form military duty therein. If he charged him as belonging to
the company, under the general militia law, he must shew that
he resided within its bounds, and was liable to enrolment. *Whit-
more v. Sanborn,* 8 *Greenl.* 228. If he charged him under the
proceedings of the Governor and Council, he must shew that
he fell within the operation of those proceedings, that is, that
he was a member of the disbanded company, and being such,
was consequently transferred to *Adams'* command, and this
must be shown by competent proof. The disbanded company,
being a local company of infantry, was composed of persons
residing within certain defined territorial limits, and neither *Ad-*

*ams* nor his clerk, could, by virtue of the proceedings of the Governor and Council, exercise command over any of the citizens, except such as resided within those limits and were liable to perform military duty. It was incumbent on the clerk, in sustaining his prosecution, to shew, *in limine*, that *Gould* resided within the limits of the disbanded company, and in order to do so he must necessarily shew what were those limits. Of this, as in all similar cases, there must exist record evidence. The company must have been originally established and its limits defined by an official act of the Governor and Council, and a regular succession of military orders, issued and passed down, for its organization. A copy of the record of all these proceedings is, or ought to be on the files of the company. If it be not there, it is to be found in some of the different offices through which it passed, or in the office of the Adjutant-General or Secretary of State, from which it emanated. As, from the nature of the case, record evidence of the limits of the disbanded company must exist, parol evidence is not admissible. When the record evidence is produced, the location of the bounds of the company as described in the record, and who reside within those bounds, may be proved by parol. Inasmuch as the justice certifies in his record, that " there was no evidence intro- " duced to prove what were the bounds or limits of the com- " pany referred to as disbanded," it did not appear that *Gould* resided within the limits of that company, or was liable to enrolment therein, and consequently it did not appear that he was included in the order of the Governor and Council attaching the members of the disbanded company to that commanded by *Adams*. The case of *Whitmore v. Sanborn*, is an authority directly applicable on this point.

We might rest here, but as it was stated at the bar, that there were many other cases depending on the same facts, and it was desirable that the principal questions raised at the trial should be decided, we proceed to their examination.

By the general law to " organize, govern and discipline the " militia of this State," *ch.* 164, *sec.* 6, " The Governor is au- " thorised and empowered by and with the advice of the Coun- " cil, to organize and arrange the militia, and to make such

Gould *v.* Hutchins.

" alterations therein, as from time to time may be deemed ne-
" cessary." Under this law the Governor and Council have
power to establish new companies and define their limits, to
divide old ones, and to abolish or consolidate those already
formed ; but they have no power to compel the members of one
company, while it exists as a company, to perform duty in an-
other. Under the same statute, *sec.* 10, the case is provided
for, where the electors refuse to fill vacancies, by neglecting or
refusing to elect, when duly notified and ordered thereto. In
such case, the Governor, with advice of Council, is required to
appoint some suitable person to fill such vacancy. Thus stood
the law until *March*, 1832, when by an additional act for organ-
izing and governing the militia, *ch.* 45, *sec.* 5, it was provided,
" that if any company shall refuse or neglect to choose officers,
" when thereto required, the Colonel or commanding officer of
" the Regiment to which said company belongs shall report the
" fact to the Commander-in-Chief, who shall immediately dis-
" band said company, and order the non-commissioned officers,
" musicians and privates thereof, to be enrolled in the oldest
" adjoining standing company, and they shall be held to do
" therein all the duties required by law." Under which of these
statutes did the Governor and Council act in passing the order
of the 16th *March*, 1832 ? They do not profess to abolish the
company, or make any alteration in its territorial limits, or ex-
tend the territorial limits of *Adams'* company so as to include
*Bourne's*. That, and that only, were they authorised to do
under the old law, and for any cause which they deemed suffi-
cient. But they profess to " disband the company" and attach
the members thereof to *Adams'* company ; what they had no
power to do under the old law, but what the Commander-in-
Chief, on the existence of a certain contingency was expressly
required to do under the new law. The only circumstance at-
tending the transaction tending to render it doubtful under which
law the order was issued, is, that the provisions of the 5th sec-
tion of the last law are to be carried into effect by the Comman-
der-in-Chief, without the intervention or advice of the Council,
which fact indicates the intention of the Legislature that the
refractory company is not to be abolished, which under the old

law could only be done by the *Governor with advice of Council*, but that it was to be disbanded by the Commander-in-Chief, and the members thereof required by him to be enrolled in the oldest adjoining company, there to perform military duty until they will choose officers for the disbanded company.   Supposing the order of the 16th of *March* to have been predicated on the 5th *sec.* of the additional act, does it render the members of " the " company of infantry in *Kennebunk-port*, formerly under the " command of *Capt. Oliver Bourne*," liable to perform military duty in the company under the command of *Adams* ?   It is only in the case where a company shall refuse or neglect to choose officers when thereto required, or refuse or neglect to do duty as prescribed by law, that the Commander-in-Chief is authorised to disband a company and order the members to be enrolled and perform military duty in another.   By the 7th *sect.* of statute *chap.* 164, the captains and subalterns of companies are to be chosen by the written votes of the members of their respective companies ;  thus securing to the members of each company the important right of electing their own officers ; and so long as they give their votes for a person eligible to the office to be filled, they cannot be considered as refusing or neglecting to choose, although the individual voted for may not be considered as the most suitable to discharge the duties of the office. If the electors all throw blank ballots, there can be no election, and the case of neglecting to choose, provided for in the statute, would exist.   If they vote for a person ineligible and who cannot hold the office, the case of neglecting to choose would exist, inasmuch as the office would remain vacant ; and the true construction of the statute must be, that they neglect or refuse to fill the vacancy by the choice of a person legally eligible to the office.   But it could not have been the intention of the Legislature, and the language of the statute will not bear such a construction, that, because the members of a company give their votes for a man whom the commanding officer of the Regiment may believe unfit to hold the office, that they are to be disbanded, divested of all their company privileges, and required to perform duty in another company.

Of the qualifications of eligible candidates and their suitable-

Gould *v.* Hutchins.

ness for office, the law, in all cases, both civil and military, makes the electors competent and final judges. The members of a company may elect very unsuitable men for officers, but it is their right under the 7th *sec.* of the law, to prefer such men if they please. The candidate whom they might believe to be the most suitable, and who in fact might be so, the commanding officer of the Regiment might deem to be a "man wholly unfit to hold "any office;" and yet they have a right to choose him under the 7th section of the militia law; and if they do so, how can it be said that they refuse or neglect to choose. It does appear by the representation on which the order of the Governor and Council was predicated, that the company voted, and it does not appear that they voted for a person ineligible or who refused to accept; and the commanding officer of the Regiment does not report that they refused or neglected to choose except by voting for a man whom he considered unfit to hold any office. We cannot believe that this presents the case on which the Legislature intended to clothe the Commander-in-Chief with a power so important, and which might be used to the great inconvenience, not to say oppression, of the citizens. A commanding officer of a Regiment might, from private feelings or personal pique, consider a person unfit to command a company, who in fact might have qualifications of peculiar excellence; and yet, if the choice of such a person is to be considered as a neglect or refusal to choose, within the meaning of the 5th section of the additional act, and the commanding officer of the Regiment may so certify it, the Commander-in-Chief is required, for the law is imperative, immediately to disband the company, and order the non-commissioned officers, musicians and privates thereof to be enrolled in the oldest adjoining standing company. We cannot so construe the law; — and believing that the communication from the Lieut. Colonel did not present such a case of neglect or refusal to choose officers as is provided for in the 5th section of the additional act, we will consider what is the situation of *Adams'* company, if the Governor and Council intended to act under the 6th section of statute *chap.* 164, which authorises them to organize and arrange the militia generally. Under that law they had full power to abolish the

company formerly under the command of *Bourne,* and extend the limits of *Adams'* company so as to include the whole of the company abolished. — If this was done at all, of which we do not find it necessary to give an opinion, it was by the order of the Governor and Council of the 16th of *March,* 1832.

By the 9th section of the additional act, before referred to, passed *March* 9, 1832, the selectmen of each town are requir-ed " to define the limits of every company of infantry, in their " respective towns, and cause the same to be recorded by the " respective clerks of said towns, and furnish the commanding " officer of said company, with a copy of their doings before the " first day of *June* then next, and the copy aforesaid shall be re-" corded in the orderly book of the company." This duty the selectmen of *Kennebunk-port* performed on the 30th of *May,* 1832, as appears by an attested copy signed by the town clerk of that town. They say, " the undersigned, selectmen of the town " of *Kennebunk-port,* in pursuance of a law of the State, have " defined the limits of the several companies of infantry in " said town, which are as follows;" &c. They then particularly describe the limits of the first company by known monuments, and the limits of the second company in the same manner, and the limits of the third company as embracing all the limits of the town not included in the other two companies.

The justice reports that it was proved that *Gould* did not reside within the bounds of the company commanded by *Ad-ams,* but was within the limits of another company, as the lim-its thereof were defined by the selectmen.

Now, if previous to this act of the selectmen, *Gould* had lived within the limits of *Adams'* company, could he any longer belong to that company after the selectmen had, by defin-ing the limits of the several companies in the town, included him in another ? It is contended that the selectmen had no power to do this. We have no means of knowing what power was intended to be conferred except by the language used to confer it. According to the best lexicographers, *to define* means to determine the end or limit, as, to define the extent of a king-dom or country ; and by *defining* is meant determining the lim-its. Such we suppose, also, to be the popular meaning of the

term, and such is the unquestionable meaning of it in other parts of our statute book. For instance, by the 7th *sect.* of *chap.* 117, towns are authorised to determine the number and " *define the limits*" of school districts within the same. There can be no doubt but to " define the limits" here means to determine, to fix, or establish the limits. If such be the meaning, then the selectmen were authorised to extend or curtail the limits of a company, as they might deem it most for the interest of the militia and the convenience of the citizens.

The Legislature might think it expedient to authorise the selectmen, if they found that a person liable to military duty, could perform it with more ease and convenience in a company other than that to which he had belonged within the same town, and that it would be proper to detach him therefrom, so to change the limits of the companies as to give relief. There could be no reason to apprehend that the selectmen would act improperly, and having personal knowledge of the situation of the military companies, and the members thereof, in their respective towns, it might well be presumed that it would promote the interests of the militia and the convenience of the citizens to clothe the selectmen with this power.

The law gave them no authority to increase the number of companies, to establish new ones, or abolish old ones; that was still retained by the Governor and Council, under the old law. Neither were the selectmen authorised to interfere with the limits of companies raised at large, such as artillery, cavalry, &c. Their authority extended only to companies of infantry, which it is understood, are in every case territorial companies, that is, limited within certain territorial bounds within each town, or corresponding with the limits of the town. Unless this was the intention of the Legislature it is not perceived what could have been the object of the law.

A subsequent Legislature repealed the section under consideration, and in addition thereto, expressly annulled all alterations that had been made under it. If the section had not given the power, the alterations would have been void without the act declaring them so. The necessity of legislative action to restore the limits to what they were before they were changed

by the selectmen, could result only from the fact that such change was authorised by the ninth section of the additional act, and consequently binding until annulled by a subsequent law.

It is our wish, as it is our duty, to give such a construction to the statute as we believe, from its language, was intended by those who enacted it. But, as was said by that eminent civilian *Sir William Jones,* " such is the imperfection of human lan- " guage that few written laws are free from ambiguity, and it " rarely happens that many minds are united in the same inter- " pretation of them."

From the best examination we have been able to give this case, it is our opinion, that *Gould,* the original defendant, was not on the 13th of *September,* 1832, by law, liable to perform military duty in the company of which the original plaintiff was clerk, and, therefore, the judgment under consideration must be reversed.